GAST ET AL. *v.* MILLER ET AL.

(No. 87CV16328 — Decided June 17, 1988.)

Hamilton County Municipal Court.

*Richard A. Bernat,* for plaintiffs.
*Rick D. DeBlasis,* for defendants.

HOGAN, J. This case was tried on June 3, 1988, and taken under advisement for decision. Both parties have filed trial briefs detailing their respective positions. The court feels, for whatever it is worth, that the practice of using trial briefs, especially in civil cases tried to the court, is much more helpful than final argument, in general, and would like to see counsel pick up on the excellent technique employed by Messrs. Bernat and DeBlasis in this case.

The facts are, for the most part, uncontested. The plaintiffs, William and Elizabeth Gast, were owners of a home on Kendall Avenue in Hyde Park. The defendants, Benson and Catherine Miller, expressed interest in purchasing the home, inspected the premises and executed with the Gasts a contract to purchase on June 17, 1986. The contract provided for a purchase price of $115,000, $5,000 of which was to be earnest money and the balance was to be paid on the date of closing. The financing contingency was described in the contract as follows:

"Offer contingent upon receiving loan commitment except for appraisal by 21 July, 1986."

In further describing how financing was to be obtained, the contract went on to say:

"Purchaser agrees to apply for and to make a diligent effort to obtain said financing. The commitment for said financing shall be obtained on or before 19 July, 1986 or this contract shall become null and void * * *."

On June 19, 1986, defendants applied for financing with the Society Bank. In the loan application, defen-

dants represented to the bank that the source of their down payment was to be the sale of existing property, further described in the loan application as 59 Warren Street, Charlestown, Massachusetts, having a net equity of $80,000. The loan applied for was in the amount of $60,000.

In the loan application, defendants represented to the bank that the Charlestown property's mortgage payments were more than satisfied by the rental income attributed to the property.

In any event, the bank, in processing the loan application, wanted a written lease to evidence defendants' statement that the income from the Charlestown property exceeded the mortgage payments. When defendants attempted to secure such a lease, the tenants, at the time on a month-to-month oral lease, declined to execute the lease and informed the Millers that they were vacating the premises. When the bank learned of this development, the defendants' loan application was denied and an adverse action notice was mailed to them on August 14, 1986, indicating that the reason for the bank's action was insufficient income and that the defendants were overextended when income and obligations were compared.

The Millers then notified the Gasts by written correspondence on August 15, 1986, that their loan application had been denied and that they would not be able to purchase the Gasts' Kendall Avenue property as planned.

The Gasts, previous to their contract with the Millers, had contracted to purchase a home on Annwood for $315,000 and had planned to finance $250,000 of the purchase price. The Gasts had planned to use $65,000 to be derived from the sale of the Kendall Avenue property as a down payment for the Annwood property and were facing a September 15, 1986 closing date on the Annwood property con-

veyance. On August 26, 1986, the Gasts contracted with Coldwell Banker to facilitate the sale of the Kendall Avenue property and agreed to pay said realtor seven percent of the sale price, and then, on September 26, 1986, contracted with a party named Bentz for the sale of the Kendall Avenue property at an agreed amount of $117,500.

Feeling that the Millers had breached their contract to purchase the Kendall Avenue property and had caused certain damages set forth in a stipulated exhibit and totalling $7,513.58, the Gasts filed this lawsuit.

The interesting issue which this case presents is whether, under the circumstances of this case, the defendants made a "diligent effort to obtain * * * financing" as they had contracted to do.

Plaintiffs take a broad view of the phrase "diligent effort to obtain financing" and view the term "financing" as encompassing the entire contract price for the purchase of the Kendall Avenue property, including the listing and sale of the Charlestown condominium. It is clear from Mrs. Miller's testimony that the difference between the purchase price for the Kendall Avenue property and the loan applied for at Society Bank was to be satisfied by part of the net equity after sale of the Charlestown condominium. Defendants, of course, take a more restrictive view of the phrase and, in their view, the term "financing" applies only to the loan proceeds. In support of their interpretation, plaintiffs point out that defendants did not have the necessary down payment in the bank[1] nor could the sale of the Charlestown condominium be closed and the net proceeds made available on or

---

[1] The record shows that the Millers had approximately $10,000 in a savings account.

before July 21, 1986, the financing deadline.

Financing is referred to in paragraph four of the contract between the parties as something that the Millers were to "apply for" and "obtain." In the language of the financing contingency itself, the term is described as something that defendants would "receive." In construing the contract, the effort is to arrive at the intent of the parties. See *State, ex rel. Maher,* v. *Baker* (1913), 88 Ohio St. 165, 102 N.E. 732. It is the court's belief that the relevant language used by the parties in the contract itself leads to the conclusion that the parties intended the restrictive view of the word "financing" to apply. For the plaintiffs' broad view to apply, one would expect that the defendants would by contract language have to "create" financing or to at least do something more active than to passively apply and then await the determination of a third party. The contract was prepared by the plaintiff, William Gast, who modified a standard Cincinnati Board of Realtors form to the situation at hand. In resolving the contractual intent issue in favor of the Millers, we are not unmindful of the legal principle that the language used in a contract will be construed most strongly against the part who drew it. See *Central Realty Co.* v. *Clutter* (1980), 62 Ohio St. 2d 411, 16 O.O. 3d 441, 406 N.E. 2d 515.

What the Millers did do is to make a solitary loan application to Society Bank. The emerging question, then, is whether this single application for financing is "making a diligent effort to obtain * * * financing" as is required by the contract. There is authority to support the conclusion that one application is a diligent effort. For example, in *Luttinger* v. *Rosen* (1972), 164 Conn. 45, 316 A. 2d 757, the single application of the purchaser was held to be due diligence. However, in the *Luttinger* case, the buyers' attorney applied for the loan on behalf of his clients at a bank he knew to be the only lending institution that would process a $45,000 loan on a single-family residence. The bank approved the loan but at an 8.75 percent interest rate, which failed to satisfy the 8.25 percent rate specified in the financing contingency. The Supreme Court of Connecticut's rationale for its decision in favor of the buyers was that multiple loan applications would be vain acts under the circumstances.

Patricia May, at the time the mortgage loan manager of Society Bank, testified that most potential buyers apply to only one financial institution for mortgage loans. May has extensive experience in real estate sales and as a loan officer. She also testified that the Millers made application to Society Bank for a loan on June 19, 1986, two days after the contract to purchase was signed, that they provided all information requested, and that they paid the fee for the appraisal and credit report.

It is this court's considered opinion that defendants exercised a diligent effort in their attempt to obtain a loan from Society Bank. The Millers provided everything necessary for the bank's determination of their eligibility. Further contact with a relatively small bank in what the testimony showed to be an extremely busy period for the bank would not have been productive because, as the bank's own correspondence with the Millers indicates, they did not obtain the loan because their income was insufficient. It is also significant that the time period during which the defendants were to secure the financing was approximately one month. Were this period extended, this court could better appreciate the argument that more than one loan application would be required in order to demonstrate a diligent effort.

The Millers' communication with the Gasts was less than diligent, but

the contract says nothing about this conduct.

Secondly, it is this court's view that plaintiffs who are suing on the contract, and therefore must establish its terms, have not met their burden of proof to establish that the efforts of the defendants to obtain financing were not diligent.

Professor Ray Aiken, Marquette University School of Law, sets forth his reasons why the burden of proof should fall on the seller:

"A procedural aspect of the 'subject to financing' condition which appears to have received little specific attention in the cases is that in respect to the burden of proof. On which party does it lie, the party seeking to enforce the main contract, or the party seeking to avoid the same on the ground that the condition has not occurred? In short, is unavailability of financing a matter of affirmative defense, which the purchaser (ordinarily) must prove?

"* * * The objective condition itself ordinarily relates to the 'ability' of the buyer-borrower to procure the indicated financing. Either expressly or by implication, as heretofore pointed out, the buyer undertakes to seek such financing 'in good faith' or 'with due diligence,' or 'by reasonable efforts.' The extent of effort, in terms of numbers of applications, duration of search, etc., which this undertaking calls for could conceivably extend from none whatsoever all the way up to an exhaustive search extending over a span of years. The question whether the requirement of 'good faith' was or was not met under given circumstances most frequently becomes the focal point of the entire litigation; but a point frequently ignored is that the de facto availability of the financing itself is a critical factor in determining the ultimate question — is a factor, indeed, without which the buyer's total absence of diligent search may easily pale

into insignificance. For who would contend that a purchase which no reasonable lender would finance, and which was expressly made contingent upon obtaining financing, was enforceable simply because the purchaser was insufficiently energetic in collecting refusals?

"Quite obviously, in all cases in which financing was not, in fact, procured, it will involve no little difficulty to prove that it was nevertheless procurable. This is true because of the essentially personal nature of the transaction. A mortgage loan which would be approved for one applicant might very well be disapproved for another, or approved under more stringent terms; and this despite the identity of the offered security in the two cases. Commercial lenders most commonly submit such applications to a board for approval, and deny to any single individual the power to grant or refuse such an application. This officer or that may be in a position, in certain cases, to give an opinion as to the probable action of his board upon a given application; but, without such action having been taken in fact, the opinion will usually require careful qualification in the hypothesis upon which it is based.

"If, as seems sometimes to have been done, the purchaser is saddled with the burden of proving unavailability of financing after diligent application therefor, in order to avoid the contract, his proofs can scarcely extend beyond the point of showing as many applications and refusals as possible. The proof of the objective 'unavailability' is proof of a universal negative.

"But if, on the other hand, the seller seeking to enforce the contract is required to prove that *available* financing was lost due to purchaser's lack of good faith application, the picture acquires a decidedly different hue. The

issue now has two facets: 1) Was the type of financing intended by the contingency available upon this purchaser's application, and 2) Was its nonprocurement due to purchaser's failure to exercise good faith efforts to procure it? Regardless of the extent to which proof of the first proposition may tend to prove the second, it must be abundantly clear that proof of the second cannot even anticipate the first, to say nothing of establishing it.

"Buyer's lack of diligence, in other words, concludes the issue against him if he has the burden of proof; but does not begin to resolve the issue if seller has that burden.

"The near-unanimous consensus of judicial opinion is that the financing contingency in these contracts constitutes a condition precedent (or 'suspensive' condition). There seems to be a similar uniformity in the authoritative position that the party who relies upon a contract as the basis of his action or defense has the burden of establishing the fulfillment of conditions precedent expressed therein. Some authorities, recognizing the occasional difficulties of proof which result from this rule, resolve the issue on the basis of comparative availability of proof, each party being required to prove that fact which is most obviously within his competence. But if the ultimate fact be availability of financing, the buyer, with his peculiar knowledge of his own finances, would hardly seem in a better position to prove the ultimate fact than would be the seller, with his peculiar knowledge of the property proposed as security. Neither would have a demonstrable advantage over the other respecting the 'tightness' or 'looseness' of the money market, nor respecting the current practices or policies of lending institutions. So that the 'peculiar knowledge' test, even assuming it to be applicable to contract disputes, would seem to afford little assistance.

"The conclusion is that the party relying upon the contract for his cause of action — ordinarily the seller under the interim contract here involved — should be required to prove the buyer's ability to procure the financing involved, and that the failure to obtain it was, in fact, due to buyer's failure to put forth a good faith attempt. * * *" (Emphasis sic.) Aiken, "Subject to Financing" Clauses in Interim Contracts for Sale of Realty (1960), 43 Marquette L. Rev. 265, 289-291. In accord is *Gray* v. *Gardner* (1821), 17 Mass. 188.

Ohio case law is replete with authority on the principle that a financing contingency is a condition precedent to the buyer's offer. 18 Ohio Jurisprudence 3d (1980) 84, Contracts, Section 187. See *F.J. Weade & Assoc., Inc.* v. *Stahl* (June 29, 1983), Fayette App. No. 82-CA-24, unreported; *Lindley* v. *Weinberg* (Dec. 9, 1986), Athens App. No. 1313, unreported. Since the financing contingency was not satisfied, there was no valid offer of the Millers for the Gasts to have accepted. Accordingly, there was no contract upon which the Millers could default.

Judgment is entered for defendants on plaintiffs' complaint and for defendants against plaintiffs in the amount of $1,000 plus costs on the counterclaim for a return of the earnest money.

*Judgment accordingly.*